IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARTEN TRANSPORT, LTD.,                    )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )        Case No. 14-2464-JWL
                                           )
PLATTFORM ADVERTISING, INC.,               )
                                           )
                    Defendant.             )
                                           )
_____)

## MEMORANDUM AND ORDER

A jury rendered a verdict in favor of plaintiff Marten Transport, Ltd. ("Marten") on multiple claims for damages against defendant PlattForm Advertising, Inc. ("PlattForm"), and the Court entered judgment based on that verdict. The parties have now filed posttrial motions. The Court **grants in part and denies in part** PlattForm's motion (Doc. # 213). The motion is granted with respect to PlattForm's request that the judgment be amended in accordance with the applicable statutory cap on punitive damages, but the motion is otherwise denied. The Court also **grants in part and denies in part** Marten's motion (Doc. # 205). The Court grants in part Marten's request for an award of attorney fees pursuant to a Wisconsin statute, and it awards fees in the amount of $431,204.80. The Court also grants in part Marten's request for an award of prejudgment interest, and the Court awards such interest at the applicable postjudgment rate on the jury's award of compensatory damages. Marten's motion is otherwise

denied.

### I.     <u>Background</u>

On May 6, 2016, after a four-day trial, a jury returned a verdict in favor of Marten on all claims submitted to it.  The jury awarded damages in the following amounts: $500,000 on Marten's claim under the Lanham Act; $250,000 on Marten's claim for trademark infringement and unfair competition under Wisconsin law; $250,000 on Marten's statutory claim under Wisconsin law; $250,000 on Marten's claim for tortious interference under Wisconsin law; and $2,000,000 on Marten's claim for punitive damages under Wisconsin law.  On the same day, the Court entered judgment in favor of Marten against PlattForm in the amounts of $500,000 for actual damages and $2,000,000 for punitive damages (in addition to postjudgment interest and costs).

In its posttrial motion, PlattForm renews various motions for judgment as a matter of law on Marten's claims pursuant to Fed. R. Civ. P. 50, and in the alternative, it requests that the Court amend the judgment in accordance with the statutory cap on punitive damages.  In its posttrial motion, Marten seeks the following relief:  an increase of its recovery of actual damages to $1,250,000; disgorgement of PlattForm's profits in the amount of $196,298.98; an award of prejudgment interest at a rate of 2.58 percent; and an award of attorney fees in the amount of $767,205.40.

## II.    Claims for Trademark Infringement and Unfair Competition

PlattForm seeks judgment as a matter of law, based on an insufficiency of evidence, on Marten's claims for trademark infringement and unfair competition under the Lanham Act and Wisconsin common law.  Judgment as a matter of law under Fed. R. Civ. P. 50(b) is improper "unless the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion."  *See Crumpacker v. Kansas Dept. of Human Resources*, 474 F.3d 747, 751 (10th Cir. 2007). In determining whether judgment as a matter of law is proper, a court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury.  *See Sims v. Great American Life Ins. Co.,* 469 F.3d 870, 891 (10th Cir. 2006).  In essence, a court must affirm a jury verdict if, viewing the record in the light most favorable to the nonmoving party, the record contains evidence upon which the jury could properly return a verdict for the nonmoving party.  *See Bartee v. Michelin North America, Inc*., 374 F.3d 906, 914 (10th Cir. 2004).  Conversely, the court must enter judgment as a matter of law in favor of the moving party if "there is no legally sufficient evidentiary basis for a reasonable jury to find for the issue against that party."  *See Sims*, 469 F.3d at 891.

### A.    *Actual Confusion*

PlattForm first argues that Marten failed to present sufficient evidence of actual confusion.  The Court instructed the jury that, in order to recover actual damages for a violation of the Lanham Act, Marten had to prove that it was damaged by actual

3

confusion or deception of users of PlattForm's website.[1]  The jury was further instructed that actual confusion could be shown by direct or circumstantial evidence.

The Court rejects this argument.  PlattForm notes that Marten did not present evidence of actual confusion in the form of driver testimony or survey evidence. Nevertheless, the evidence was sufficient, when viewed in Marten's favor, to support an award of damages for a violation of the Lanham Act.  The jury heard evidence that PlattForm's website was set up to allow a user to apply for driver jobs with trucking companies; that PlattForm did not forward to Marten applications for jobs with Marten completed by users, but PlattForm instead directed them to an internal address; and that PlattForm did not inform users that applications for Marten jobs would not reach Marten. One may reasonably infer from the evidence that a user would expect that if he or she tried to apply for a job with a company through the feature that allowed for the submission of an application, then the application would be delivered to that company. At least one employee of PlattForm testified that users would have such an expectation. Thus, there was evidence to show that applicants who submitted applications for Marten jobs were actually confused concerning whether Marten would receive those applications.

PlattForm contends that users who used the "apply all" feature in an attempt to

---

[1]A showing of actual confusion was not required for the jury to award damages on Marten's claim for trademark infringement and unfair competition under Wisconsin common law.

apply to multiple companies would not necessarily have intended specifically to apply to Marten, and thus they would not have been actually confused about whether Marten received applications. The evidence established, however, that Marten was listed on the website as a trucking company offering employment, and it is reasonable to infer that at least some "reply all" applicants understood that they were applying to a group of companies that included Marten. Moreover, PlattForm is incorrect in suggesting a lack of evidence that any applicant applied only to Marten (without using the "apply all" feature). Testimony and documents indicated that *most* (not all) of the applications to Marten were through the "apply all" feature, and one internal PlattForm e-mail provides evidence that at least 195 users applied directly to Marten through the site. Thus, Marten presented sufficient evidence of actual confusion here.

PlattForm also argues that there was no evidence that users associated the relevant marks on the site with Marten. PlattForm relies on *Vail Associates, Inc. v. Vend-Tel-Co., Ltd.*, 516 F.3d 853 (10th Cir. 2008), in which the Tenth Circuit stated that although users "need not have knowledge of the particular company behind a service source before confusion may occur," they "must associate the company's mark with its services." *See id.* at 865. The case is easily distinguished, however, as consumers in that case did not necessarily associate a "Vail" mark with a particular company instead of with the geographical area. *See id.* In this case, one may reasonably infer that if users were applying for truck driving jobs on PlattForm's site and Marten was listed as a company to which they could apply, then the users would have associated Marten's name and

marks with a trucking company offering driving jobs. Accordingly, there is no basis to disturb the jury's finding of actual confusion in this case, and PlattForm's motion is denied with respect to this issue.

### B.    *Notice of Registration*

In seeking judgment on the Lanham Act claim, PlattForm next argues that Marten did not provide evidence of notice to PlattForm that Marten's trademarks were registered. 15 U.S.C. § 1117(a) provides for recovery under the Lanham Act subject to Section 1111; and 15 U.S.C. § 1111 provides that if a trademark registrant fails to give statutory notice by use of certain words or the ® symbol with the mark, then the registrant cannot recover under the Act unless the defendant had actual notice of the registration. PlattForm argues that Marten did not provide any evidence either that it provided statutory notice with its marks or that PlattForm had actual notice that Marten's marks were registered trademarks.

The Court rejects this argument. The jury instructions did not require Marten to prove such notice as requirement for its recovery of damages under the Lanham Act. Notice of registration did not present an issue of fact for the jury because that fact was deemed undisputed. PlattForm did include the issue of notice in its Rule 50 motion at trial, but once the Court denied that motion, PlattForm could only have prevailed on the Lanham Act claim on this basis by having the jury find that Marten failed to prove such notice; PlattForm, however, did not propose a jury instruction that included such a requirement of proof, nor did it object to the Court's instructions that omitted such a

requirement.  Thus, PlattForm waived any argument that the jury's verdict in favor of Marten on this claim was improper.  *See* Fed. R. Civ. P. 51(d), (e) (objection required to assert error relating to instructions).

PlattForm cites cases indicating that the lack of notice is not an affirmative defense but is instead a limitation on damages, and that the plaintiff therefore bears the burden to show the required notice.  *See, e.g.*, *United States v. Sung*, 51 F.3d 92, 94 (7th Cir. 1995) (lack of notice is not a "defense" and thus is not an element in a criminal case under a statute incorporating "defenses" of Lanham Act actions); *Derrick Mfg. Corp. v. Southwestern Wire Cloth, Inc.*, 934 F. Supp. 796, 812 (S.D. Tex. 1996) (citing *Sung* in assigning the burden of proof to the plaintiff on the issue of notice).  But even if the lack of notice does not represent an affirmative defense on which the defendant bears the burden of proof, the burden was on PlattForm to inform Marten during the litigation that it sought to limit damages on account of a lack of notice.  PlattForm thus was required to set out in the pretrial order that it sought to limit Marten's recovery on that basis.  *See* Fed. R. Civ. P. 16(d), (e) (pretrial order controls the course of the action, order may be modified only to prevent manifest injustice); D. Kan. Rule 16.2(b) (same); *Hullman v. Board of Trustees of Pratt Community Coll.*, 950 F.2d 665, 667 (10th Cir. 1991) ("The trial court has discretion to exclude from trial those issues and claims not found in the pretrial order."); *Unified Sch. Dist. 467 v. Leland A. Gray Architects, LLC*, 2016 WL 1438365, at *2 (D. Kan. Apr. 12, 2016) (defendant runs the risk of waiving any defenses not included in the pretrial order).  PlattForm did not preserve in the pretrial order any

contention that Marten could not recover damages under the Lanham Act because of a lack of notice of registration. In light of that omission—and the fact that PlattForm's proposed jury instructions did not include notice as a requirement[2]—Marten was justified in not submitting evidence specifically to satisfy the requirement of notice.

Moreover, the Court does not agree with PlattForm that the record is devoid of evidence of notice. PlattForm is correct that, in the screenshots from PlattForm's websites that were admitted into evidence, the Marten logo is too small and indistinct to reveal the ® symbol found therein. One e-mail chain between the parties that was admitted in evidence (Exhibit 450), however, contains a depiction of a Marten mark in which the ® symbol may be discerned. In addition, in the written agreement that PlattForm proposed for use with Marten, the license provision (on which PlattForm relied in arguing that its use of Marten's marks was authorized) refers to the parties' trademarks. Those pieces of evidence support reasonable inferences that Marten provided statutory notice with its marks and that PlattForm had notice that Marten's logos were registered trademarks. PlattForm did not offer any contrary evidence at trial. Indeed, PlattForm has never argued that Marten's marks in fact do not include the ® symbol or that it in fact lacked notice that Marten's logos were registered trademarks.

Finally, as the Court ruled before trial, it could take judicial notice that certain content appeared on the internet, including with respect to Marten's content on

---

[2]In fact, PlattForm's proposed instructions *required* the jury to accept as fact that Marten's marks were valid and registered.

PlattForm's sites. *See Marten Transport, Ltd. v. PlattForm Advertising, Inc.*, 2016 WL 1718862, at *2-3 (D. Kan. Apr. 29, 2016). The ® symbol can be seen not only in images of Marten's logos on the internet, but also in the images of Marten's logo that appeared on PlattForm's websites, as seen on the archive accessed by the Wayback Machine. Thus, if PlattForm had preserved this issue, and even in the absence of evidence submitted by Marten, the Court could have taken judicial notice of facts satisfying the notice requirement; and in the absence of contrary evidence concerning notice, submission of the issue to the jury would still have been unwarranted. Accordingly, the Court denies this basis for judgment as a matter of law on the Lanham Act claim.

## C.    *Unauthorized Use*

PlattForm also seeks judgment as a matter of law on the trademark claims—and on all claims—on the basis of its argument that any uses of Marten's marks or name on its websites were authorized by Marten. As it did at trial, PlattForm argues that a license provision in the written "TMG Agreement" between the parties authorized PlattForm's use of Marten's marks. The Court instructed the jury concerning PlattForm's affirmative defense that a license existed here, but the jury found in a special interrogatory that PlattForm had *not* proved that Marten granted a license to use its information on the sites. Thus, by its motion, PlattForm seeks to overturn that finding by the jury.

The Court concludes, however, that the jury could reasonably have found that Marten's alleged agent, ACS, did not manifest assent to the terms of the TMG Agreement. The evidence included an e-mail by which PlattForm told ACS that it would

need the written agreement signed and returned, but PlattForm was unable to produce any copy of the agreement actually signed by ACS or Marten (even though PlattForm was able to produce similar written agreements signed by ACS on behalf of other clients). That evidence alone allows for a reasonable inference that ACS did not intend to agree to those terms and did not manifest any such agreement. In addition, a witness from ACS testified that ACS did not enter into any such agreement, that it did not execute such agreements as a matter of policy, that Marten had not authorized ACS to enter into any such agreement, and that Marten had authorized agreement with PlattForm only through the use of "insertion orders" for the placement of advertisements on PlattForm's sites. A representative of Marten also testified that Marten had never seen the proposed written agreement and that it did not grant ACS any authority to enter into the written agreement or to grant the broad license included in that agreement. Finally, the jury heard evidence indicating that the parties' relationship did proceed through the use of insertion orders, and there was no evidence that PlattForm either insisted that ACS or Marten execute the written agreement (after the initial proposal of the agreement) or that PlattForm ever referred to or considered the agreement as effective.

PlattForm argues that the parties acted in conformity with the agreement (thus providing evidence that ACS accepted the agreement's terms), based on evidence that ACS returned a client information sheet on Marten and that PlattForm provided regular reports to ACS, both as required in the agreement. The other evidence, however, provided a basis for a reasonable inference by the jury that ACS, in returning the

10

information sheet, did not intend or manifest an intent to be bound to the license provision contained in an unsigned written agreement. Accordingly, the Court denies PlattForm's motion for judgment on this basis.

### D. *Likelihood of Confusion*

PlattForm further argues that it is entitled to judgment on the trademark claims because Marten failed as a matter of law to prove the necessary likelihood of confusion. The jury was instructed that the following factors may be considered in evaluating whether there was a likelihood of confusion:

> (1) evidence of actual confusion; (2) the strength of the contesting mark; (3) the degree of similarity between the competing marks; (4) the intent of the alleged infringer in adopting the contested mark; (5) the degree of care that consumers are likely to exercise in purchasing the parties' products; and (6) the similarity of the parties' products and the manner in which they market them.

*See Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1143 (10th Cir. 2013). The jury was further instructed that this list is non-exhaustive, that no one factor is dispositive, and that "[t]he importance of any particular factor in a specific case may depend on a variety of circumstances, including the force of another factor." *See id.*

The Court rejects this argument. Considering the evidence as a whole in the light most favorable to Marten, the jury could quite reasonably have weighed these factors to find a likelihood of confusion among users of PlattForm's websites. In particular, as discussed above, *see supra* Part II.A, the evidence indicated that users were actually confused concerning whether applications for Marten jobs would be delivered to Marten,

11

and, as the jury was instructed, "[a]ctual confusion in the marketplace is often considered the best evidence of likelihood of confusion." *See Water-Pik*, 726 F.3d at 1144. Moreover, the jury could reasonably have determined that the third and sixth factors weighed in Marten's favor, as PlattForm used Marten's actual marks, and both parties solicited applications for truck driving jobs.

With respect to the fourth factor, the relevant intent, as the jury was instructed, is the intent to derive benefit from the reputation or goodwill of the plaintiff. PlattForm points to evidence that it left Marten's marks on its site to help its search engine optimization (SEO) or to protect against damage to the site. The jury could reasonably have found, however, that PlattForm believed that the presence of Marten and other big trucking companies enhanced and drove traffic to the site,[3] which in turn made the site more attractive to companies purchasing ads. Moreover, as the jury was instructed, a prior relationship between the parties provides evidence of such intent, *see Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 927 (10th Cir. 1986), and in this case, Marten had previously placed ads on this site and on another PlattForm site. In addition, the deliberate adoption of a similar mark can give rise to the inference of an intent to benefit from the plaintiff's goodwill. *See Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1161 (10th Cir. 2013).

In summary, the jury was charged with weighing various non-dispositive factors,

---

[3]Indeed, the jury heard evidence that PlattForm placed craigslist ads for Marten in order to drive traffic to the sites.

and there was sufficient evidence to support weighing a number of the factors in Marten's favor. The Court cannot conclude as a matter of law that a reasonable jury could not have weighed these factors and found a likelihood of confusion in this case. Accordingly, the Court denies PlattForm's motion for judgment as a matter of law on this basis.

### III.   Wisconsin Statutory Claim

PlattForm seeks judgment as a matter of law on Marten's claim based on a violation of Wis. Stat. § 943.203. The Court instructed the jury that Marten had to prove each of the following elements of this claim: (1) PlattForm intentionally used Marten's identifying information without Marten's authorization or consent; (2) PlattForm did so for the purpose of obtaining anything of value or for the purpose of harming the reputation or property of Marten; and (3) PlattForm did so by representing that it was acting with the authorization or consent of Marten. *See id.*

#### A.   *First Element*

PlattForm first argues that Marten failed to prove the first element. PlattForm argues that the license in the TMG Agreement provided authorization to use Marten's information; as concluded above, however, sufficient evidence supported the jury's specific finding that no license existed here. *See supra* Part II.C.

PlattForm also argues that Marten failed to prove that PlattForm *knew* that it did not have Marten's authorization. The Court's instruction for this claim, however, did not

require any such proof. PlattForm's proposed instruction included such an element, but the Court declined to include that language, and PlattForm did not object to the Court's instruction for this claim. Thus, PlattForm waived any challenge to the Court's formulation of the elements of this claim. *See* Fed. R. Civ. P. 51(d)(1). In addition, the Court does not believe that such proof of the defendant's knowledge of a lack of consent was required here. As authority for such an element of proof, PlattForm cites only an unpublished opinion in *State v. Johnson*, 2014 WL 3710029 (Wis. Ct. App. July 29, 2014) (unpub. op.). The court in *Johnson* cited only Wisconsin's pattern jury instructions for criminal cases. *See id.* at *5. The cited pattern instruction, however, has a note indicating that the language regarding knowledge is from another Wisconsin statute that defines "intentionally" when used in a criminal statute. *See* Wis. JI-Criminal 1459 n.vi. Such a standard did not apply here because there was no need for a showing of criminal intent; rather the claim was based on Wis. Stat. § 895.446, a statute providing for civil liability for conduct prohibited by Wis. Stat. § 943.203, a criminal statute. Moreover, in *State v. Moreno-Acosta*, 857 N.W.2d 908, 911 (Wis. Ct. App. 2014), the court held that the only "intentionally" element in the statute relates to purpose and not to knowledge. Thus, the Court concludes that the elements for this claim were appropriately taken directly from the language of the statute, and there was no basis to add an element requiring proof that the defendant knew of the lack of authorization.

Finally, even if such proof were required, the Court does not agree that the record was devoid of evidence to support a reasonable inference that PlattForm knew it lacked

authorization.  As discussed above, *see supra* Part II.C., PlattForm could not produce a signed copy of the agreement, even though it asked that it be signed and returned by ACS, and PlattForm did not complain thereafter that no agreement had been signed, or refer to the agreement as governing the parties' relationship.  Moreover, PlattForm deliberately chose to leave Marten's marks on its site while eliminating delivery of the applications after Marten declined to purchase ads on the site.  There was no evidence that PlattForm invoked the license when it made that decision.  Thus, the record supports reasonable findings that PlattForm did not believe that its actions were justified by a license agreement and that PlattForm knew that it was using Marten's marks without authorization.

### B.    *Third Element*

PlattForm also asserts that Marten did not prove the third element of this claim, which required proof that PlattForm used Marten's information "by representing that it was acting with the authorization or consent of Marten."  PlattForm argues that it made no such representation and that it did not act "by" such representation.  The Court concludes, however, that there was sufficient evidence on this issue to support the jury's verdict.  PlattForm essentially represented on its site that users could apply for driver jobs with certain trucking companies.  One could reasonably infer that implicit in that representation was a representation that those companies approved of PlattForm's solicitation of those applications—particularly given the obvious structure of the site as one on which users could apply for free with companies that paid PlattForm to be

included on the site.  The Court denies PlattForm's motion for judgment on this claim.

### IV.   Tortious Interference Claim

In summary fashion, PlattForm seeks judgment on Marten's claim under Wisconsin law for tortious interference with a prospective contractual relationship. PlattForm argues that Marten did not prove the required existence of a prospective employment relationship with any individual because Marten did not provide evidence that it would have hired any particular person who tried to apply through PlattForm's site.  In support of this argument, PlattForm cites only an unpublished case, *Neri v. Pinckney Holdings, LLC*, 2014 WL 958875 (Wis. Ct. App. Mar. 13, 2014) (unpub. op.), in which the Court upheld the dismissal of a tortious interference claim at the pleading stage.  *See id.* at *2.  In that case, the plaintiff had not set forth any actual prospective business, but had merely speculated that such contracts would have been created.  *See id.*  In the present case, however, the prospective employees comprised a discrete group of individuals who had attempted to apply for a job with Marten, on a job board from which Marten had hired in the past.  Thus, the prospect of a contractual relationship with an applicant was not purely speculative.  PlattForm has not cited any caselaw suggesting that this type of evidence is insufficient as a matter of law to support a claim for tortious interference under Wisconsin law.  Accordingly, the Court denies PlattForm's motion for judgment on this claim.

### V.    <u>Compensatory Damages</u>

#### A.    <u>*Lost Profits*</u>

PlattForm moves for judgment as a matter of law on Marten's claim for damages in the form of lost profits.  At trial, Marten argued to the jury that Plattform's conduct caused it to suffer lost profits because PlattForm withheld applications, Marten would have hired some of those drivers, and Marten therefore lost revenue and profits on work that additional drivers could have performed.  More specifically, Marten asked the jury to calculate those lost profits using the following figures: 5,157 applications were withheld; four percent of applications to Marten historically have resulted in hires; the average driver works 52 weeks for Marten; Marten earns an average of $3,490 per week per driver in revenue; and Marten's average profit margin on such revenue is 10.79 percent.  PlattForm attacks nearly every step in that chain in arguing that Marten's damage theory was too speculative as a matter of law.

With respect to the proof of damages for lost profits under the Lanham Act, the Tenth Circuit has stated as follows:

> Although the quantum of damages, as distinguished from entitlement, must be demonstrated with specificity, courts may engage in some degree of speculation in computing the *amount* of damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing.

*See Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 525 (10th Cir. 1987) (quoting *PPX Enters. Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 271 (2d Cir. 1987)).  As far back as 1954, in *United States v. Griffith, Gornall & Carman, Inc.*, 210 F.2d 11 (10th

Cir. 1954), a case on which PlattForm relies, the Tenth Circuit appreciated this distinction between proving the fact of damage and the amount in tort actions:

> Prospective profits are necessarily somewhat uncertain and problematical, but in cases where damages are definitely attributable to the wrong of the defendant and are only uncertain as to amount, they will not be denied even though they are difficult of ascertainment. . . . The fact of damage, however, must be proved to a certainty. Mathematical exactness as to the amount is not required but the evidence must form a basis for a reasonable approximation. The court must have before it such facts and circumstances to enable it to make an estimate of damage based upon judgment, not guesswork.

*See id.* at 13 (citations omitted); *see also* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:72 (4th ed. 2016) ("Courts often draw a sharp distinction between the rigor required in proving the *fact* of damage as compared with proving the *amount* of damage."). Thus, the Court considers whether PlattForm is challenging Marten's proof with respect to the fact of damages in the form of lost profits or the amount of those damages.

PlattForm's briefs have not been consistent on this point. In its initial posttrial brief, PlattForm generally argued that Marten did not prove that it suffered *any* lost profits, that Marten's claim that it suffered *any* damages was too speculative.[4] Then, at

---

[4] Some examples of arguments from the introduction and conclusion of the section of that brief concerning lost profits are as follows: "Marten did not establish that it suffered actual damages . . .;" "Marten failed to establish that it lost a single dollar in additional revenue . . .;" "Consequently, because Marten failed to establish that it lost a single cent of profit . . ., Marten established no reasonably certain damages . . .;" the jury was required to make assumptions "[t]o arrive at a finding that Marten incurred any lost profit damages whatsoever."

the beginning of its reply brief, PlattForm argued as follows:

> Instead of actually proving that it lost any sales whatsoever, Marten argues that because courts allow some degree of speculation in computing the <u>amount</u> of damages, and because Marten's damage equation called for a great deal of speculation in relation to every single variable, Marten must therefore be entitled to lost profits. But Marten's claim for lost profits fails not because it required the jury to speculate as the amount, but rather because Marten failed to prove through competent evidence that it lost a single penny of profit as a result of PlattForm's alleged infringement. Before a jury may speculate regarding the *amount* of lost profits, a plaintiff must cross the threshold of establishing that it *suffered* lost profits—although "courts may engage in some degree of speculation in computing the *amount* of damages," "the quantum of damages . . . must be demonstrated with specificity." (Citing *Brunswick*.)

At the conclusion of this section of the reply brief, PlattForm repeated this point:

> Marten's claim for lost profits fails not because it required the jury to speculate as to the amount, but rather because Marten failed to prove that it lost a single penny of profit as a result of PlattForm's alleged infringement.

In another place in that section, however, PlattForm, in attempting to distinguish a case cited by Marten, adopted a completely contradictory position:

> Here, unlike in *Australian Gold*, Plattform specifically challenges the amount of the verdict, arguing that every single variable in Marten's damage formula is flawed and that Marten provided the jury no basis to determine Marten's damages to a reasonable certainty. The question here is not whether Marten suffered any measurable amount of damages, but rather whether Marten established lost profits with reasonable certainty and specificity. (Citation and internal quotation omitted.)

Based on an examination of the actual arguments made by PlattForm with respect to the particular steps in Marten's theory of lost profits, it appears that PlattForm generally argues a lack of proof that Marten suffered *any* lost profits, with PlattForm disputing a

19

specific figure only with respect to the number of applications withheld.  The Court addresses PlattForm's arguments accordingly.

PlattForm first argues as a general matter that "overall company performance indicators, as presented by Marten at trial, without evidence of actual damages caused by the infringement are not sufficient as a matter of law to establish lost profits in a trademark case."  By this argument, PlattForm appears to take issue with Marten's reliance on its historical averages for its hiring rate and its revenues and profits earned for each driver.  PlattForm, however, has not cited any authority that actually supports the statement that "overall company performance indicators" may not be used to establish lost profits.  The cases cited by PlattForm in a long string cite after that statement do not support the statement, but rather they support the more general proposition that lost profits must be shown by sufficient evidence and not merely through speculation.  Moreover, as discussed below, other evidence beyond the mere company averages supports a reasonable inference that Marten did suffer actual damages in this case.

PlattForm first attacks Marten's claim that PlattForm's conduct denied it 5,157 applications.  PlattForm argues that there is no evidence that Marten would actually have received *any* applications if not for PlattForm's conduct.  PlattForm also appears to take issue with the specific figure of 5,157, however.  Thus, the Court first addresses that argument.

In an internal e-mail chain from the time immediately following the cease-and-

20

desist letter, a PlattForm employee asked for the number of "apps" generated for Marten on the relevant website since May 2012, and another employee responded with the 5,157 figure. PlattForm argues that reliance on that figure was improper because it encompassed a period of time outside the period of infringement beginning in August 2012. PlattForm notes that in the pretrial order Marten presented its damage claim using a figure of 4,260, based on an estimate of 897 applications for the period from May 1, 2012, to August 7, 2012. PlattForm argues that Marten failed to present at trial a basis for reducing the 5,157 figure in that way, and that Marten's entire claim therefore fails.[5]

The Court does not agree that Marten's reliance on the 5,157 figure in its arguments to the jury dooms the entire claim. The number of applications bears on the amount of damages, not the fact of damages, and as PlattForm agrees, some speculation and approximation with respect to the amount is permitted. It is significant that PlattForm itself, in investigating the issue after the cease-and-desist letter, chose May 2012 as a relevant starting date for counting the number of applications to Marten. Moreover, there was evidence from which the number of applications from May through July 2012 could be approximated. For instance, one exhibit indicated that 279 Marten applications were received on the site in July 2012. In addition, evidence was received concerning the number of Marten applications through the site in May 2013 (262 applications) and June 2013 (359 applications), and in the latter case, a PlattForm

---

[5]PlattForm did not object at trial on the basis that Marten's used a figure greater than the figure used in the pretrial order.

employee noted that that figure looked accurate based on previous months' figures.[6]
Thus, there was evidence from which the number of applications withheld during the
relevant period could be reasonably approximated, and PlattForm was free at trial to
offer its own evidence to show that a different figure should be used. The Court thus
rejects this argument that the number of applications withheld could not be reasonably
estimated.

PlattForm also argues that, although it may have withheld applications submitted
on the website for Marten jobs, Marten did not offer evidence that it would in fact have
received those applications if PlattForm had not infringed by continuing to include
Marten on the website. The Court concludes, however, that the evidence, viewed in the
light most favorable to Marten, supports the reasonable inference that Marten would
have received at least some additional applications if not for the infringement. As
discussed above, there was ample evidence that users of the website were actually
confused about whether Marten would receive their applications. A large number
attempted to apply to a group of specific companies that included Marten, and some
attempted to apply *only* to Marten from the website. Thus, if Marten had not been listed
on the website, it is reasonable to infer that at least some individuals would have instead
submitted applications to Marten directly or through other internet job boards or in some

---

[6]This evidence disposes of PlattForm's argument that because the 5,157 figure
related to a period that included time outside the period of infringement, there was
actually no evidence that *any* applications were withheld during the particular period of
infringement.

other way.

In support of this argument, PlattForm cites *Furniture "R" Us, Inc. v. Leath Furniture, LLC*, 2008 WL 4444007 (S.D. Fla. Sept. 26, 2008), in which the court referred to the speculation required for a jury to discern whether customers would have shopped at the plaintiff's store instead of the defendant's store if not for deceptive advertising. *See id.* at *4. That case is not particularly helpful, however, as that court was applying various factors to determine a question of standing. Moreover, in the present case, there is a basis from which to infer that the drivers would have applied to Marten, as the fact that they did attempt to apply to Marten through PlattForm's site demonstrates an interest in applying specifically to that company.

The Tenth Circuit's opinion in *Brunswick* is more applicable here. In that case, the plaintiff based its damage claim on the theory that it lost one sale of a particular product as a result of each sale of an infringing product by the defendant, and the Tenth Circuit reversed the district court's rejection of that claim. *See Brunswick*, 832 F.2d at 525-26. The court stated: "While this court does not necessarily believe that each [sale by the defendant] resulted in a corresponding loss of sale by [the plaintiff], the theory provides an upper range for an award of damages." *See id.* at 526. The court concluded that additional evidence concerning the decline in sales of the product provides "the court with a broad basis from which it may arrive at a fair, if not precise, amount with which to compensate [the plaintiff] for wrongful infringement." *See id.*

The present case is not completely analogous—Marten did not lose sales of a

23

product because of the infringement, and thus it cannot avail itself of declining revenue figures to prove its loss. There was evidence, however, that Marten hired drivers from internet job sites, including the site at issue here, that it was affected by an industry driver shortage, and that it turned down jobs because of a lack of drivers. Moreover, one could reasonably infer that the result of PlattForm's conduct was that Marten did not receive applications that it would have otherwise received. It is true (as in *Brunswick*) that it is not necessarily believable that *all* 5,157 applicants in fact would have applied to Marten in some other way if Marten had not been listed on the website; but (as in *Brunswick*) that figure sets an upper range for possible damages, which may be determined by approximation and some degree of speculation. In light of the evidence, the fact that Marten would not have received applications from *all* who applied through the site does not mean that Marten's lost profits claim is too speculative as a matter of law, as the evidence supported the reasonable inference that Marten would at least have received applications from some drivers.

PlattForm next challenges as speculative the assumption that Marten would have hired drivers who attempted to apply to Marten through the website. PlattForm notes the testimony that Marten generally filled open positions and that Marten failed to perform any analysis to show that it would have hired the particular individuals who submitted applications through the site. The Court rejects this argument. The jury heard evidence that there was a driver shortage; that Marten was constantly hiring drivers; that Marten could and would have hired up to thousands more drivers during the relevant period

24

(even though Marten's damage theory assumed only 200 additional hires); that Marten turned down work because of a lack of drivers; and that Marten actually did hire from internet job websites, including from the site at issue here prior to the infringement. Thus, the jury could reasonably infer that Marten would have hired some of these individuals, based not purely on conjecture but on evidence submitted at trial.

The case cited by PlattForm, *ThermoLife Int'l, LLC v. Gaspari Nutrition, Inc.*, 871 F. Supp. 2d 905 (D. Ariz. 2012), is easily distinguished. In that case, the court dismissed at the pleading stage a claim for tortious interference, concluding that it was too speculative to assume that the plaintiff would have entered into contracts at an expo if it been allowed to attend. *See id.* at 912. In the present case, however, the plaintiff was not merely speculating that it would have made money in some new forum; rather, plaintiff submitted evidence that it turned down business because of lack of drivers and that it had in the past hired drivers who used this site and similar sites. Thus, the present claim that Marten would have hired some of these drivers is rooted in the evidence. PlattForm's argument that Marten would not necessarily have hired any drivers goes to the weight of the evidence and not to the legal sufficiency of the claim for damages.

Finally, PlattForm argues that there was no evidence that Marten lost jobs (and thus lost profits) because of PlattForm's conduct. PlattForm notes that Marten did not identify particular lost jobs with specificity or present relevant data, and it argues that Marten's claim was therefore improperly speculative. The Court rejects this argument as well. One could reasonably equate drivers with jobs and profit, as Marten presented

evidence that it could and would have hired many more drivers, that it turned down jobs because of a lack of drivers, and that it generally made a profit on such jobs. Thus, once again, Marten's claim was not merely conjectural but was based on evidence. PlattForm has not cited authority indicating that a claim is too speculative as a matter of law unless the plaintiff identifies all lost jobs with specificity.

PlattForm's cases do not compel a different result. PlattForm relies on the Tenth Circuit's opinion in *United States v. Griffith, Gornall & Carman, Inc.*, 201 F.2d 11 (10th Cir. 1954). In *Griffith*, the court disallowed a claim for lost profits based solely on the testimony of the president of the plaintiff construction company, who could not state the exact amount of the lost profits and who did not identify particular jobs lost. *See id.* at 13-14. In that case, however, the testimony indicated that the plaintiff did not operate year-round and that weather conditions controlled its operations, and there had been no evidence that the weather would have allowed the plaintiff to obtain any contracts during the period in question. *See id.* at 14. There was no similar disabling condition in the present case, and Marten's evidence was not limited to speculation by its employees but included historical data.

*Otis Clapp & Son, Inc. v. Filmore Vitamin Co.*, 754 F.2d 738 (7th Cir. 1985), is also distinguishable. In that case, the plaintiff's own evidence showed that consumers were not influenced enough by the defendant's conduct to cease using the plaintiff's products, and the appellate court upheld the determination of the district court *as factfinder* that the plaintiff had failed to prove any lost sales. *See id.* 741-42, 745-46.

In the present case, evidence supported the reasonable inference that Marten lost revenue and profits as a result of PlattForm's conduct, and thus there is no basis to disallow the claim for lost profits as a matter of law.

PlattForm also cites an unpublished case, *Jeffrey Chain, L.P. v. Tropodyne Corp.*, 2000 WL 1888719 (6th Cir. Dec. 20, 2000), in which the court reversed a jury award of lost profits on the basis that such damages were speculative. *See id.* at *5-6. The court noted that plaintiff had not identified a single job lost to the defendant, and that the plaintiff's damage calculation had not accounted for other relevant factors that might have caused its decline in sales. *See id.* at *5. In that case, however, the plaintiff's evidence was undermined by the fact that the data showed that the period of decline in plaintiff's sales did not match up with the period of infringement, and there was no non-conjectural evidence of confusion in the market. *See id.* Again, the present case is distinguished by the presence of evidence supporting both a finding of actual confusion and the fact that Marten lost profitable business as a result of PlattForm's conduct. Accordingly, the Court denies PlattForm's motion for judgment as a matter of law on Marten's claim for lost profits.[7]

### B.   *Restorative Advertising*

PlattForm also seeks judgment as a matter of law on any claim by Marten for

---

[7]The Court rejects PlattForm's arguments relating to Marten's particular profit margin, as they bear on the *amount* of Marten's damages, which may be shown by approximation and some degree of speculation.

damages associated with restorative advertising.  In the pretrial order, Marten sought

damages for loss of reputation, as measured by the cost of restorative advertising.  At the

close of Marten's case, PlattForm moved for judgment as a matter of law on this claim,

based on a lack of evidence of any such advertising, and the Court did not rule on that

issue at that time.  At the close of PlattForm's case, the Court took up the issue of

Marten's allowable damages, and it granted judgment to PlattForm on the claim for loss

of goodwill, on the basis that there had been no evidence presented regarding any

restorative advertising.  Thus, to the extent that PlattForm seeks judgment as a matter of

law on such a claim, that motion is denied as moot, as the Court has already granted the

requested judgment.

Despite that judgment, the Court instructed the jury that it could consider the

following types of damages claimed by Marten in the case: "Marten's lost profits;

Marten's costs for restorative advertising; and other costs Marten incurred as a result of

PlattForm's conduct."  Based on that instruction, PlattForm moves in the alternative for

a new trial on the issue of damages.  PlattForm argues that it cannot be determined from

the verdicts whether the jury improperly awarded any damages for restorative advertising

(despite the lack of any evidence of such damages).

The Court denies the alternative motion for a new trial on this basis.  First,

PlattForm did not object to the quoted language from the Court's instruction on damages.

PlattForm argues that it had no duty to object because the instruction was correct, in the

sense that the Court had permitted the claim for restorative advertising damages to go

to the jury.  The Court, however, had not taken PlattForm's motion for judgment under advisement, as PlattForm now argues; rather, prior to the instruction conference, the Court definitively granted judgment to PlattForm on the basis of a lack of evidence of restorative evidence.  Thus, PlattForm waived any argument that the instruction improperly allowed the jury to find such damages.

Moreover, the Court concludes in this case that there is no uncertainty about the basis for the jury's damage awards because, as both sides agree, there was no evidence whatsoever that Marten incurred any costs for restorative advertising, and in its closing argument, Marten only requested damages for lost profits.  Thus, there is no reason to believe that the jury improperly intended some portion of its damage awards to account for such nonexistent costs.  The cases cited by PlattForm in its reply brief are distinguishable, as in this case the jury did not specifically find any damages for restorative advertising, and there was no evidence on which the jury could have based such an award of damages.  *Cf. Wickman v. Henderson*, 19 F. App'x 740, 744 (10th Cir. 2001) (unpub. op.) (unknown if jury awarded damages on claim improperly submitted where jury heard evidence of damages on that claim); *Barber v. Whirlpool Corp.*, 34 F.3d 1268, 1278 (4th Cir. 1994) (retrial of damages necessary where jury specifically found for plaintiff and thus may have awarded damages based on the improperly-submitted claim).  Accordingly, the Court denies PlattForm's alternative motion for new trial.

### C.    *Amount of Judgment*

Despite the jury's separate awards of damages on four different claims, the Court entered judgment for actual damages in the amount of $500,000, representing the amount of the highest award by the jury. The Court did so because the damages for the various claims were duplicative, representing Marten's claim for lost profits from the use of its marks on PlattForm's site. If a jury awards duplicative damages, the Court is obliged to enter judgment to avoid duplication. *See United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1235 (10th Cir. 2000). Whether damage awards are duplicative presents a question of fact for the Court. *See id.*

Marten now requests that the judgment be amended to include actual damages in the total amount of $1,250,000, representing the sum of the jury's four damage awards. Marten proposes two bases for such an amendment. First, Marten moves to amend the judgment pursuant to Fed. R. Civ. P. 59(e), on the basis that the jury's awards are not duplicative. Second and alternatively, Marten requests that the award be increased pursuant to 15 U.S.C. § 1117(a), which provides for enhanced damages up to three times the amount of actual damages. The Court addresses those arguments in turn.

### 1.   DUPLICATION OF DAMAGES

Marten argues that the jury's various damage awards are not duplicative. Marten argues that it presented a theory of damages exceeding $3 million and that PlattForm did not present an alternative damage calculation. Marten argues that the jury therefore must have divided an intended total award of $3,250,000 among the four awards of actual damages and the $2 million punitive damage award.

The Court disagrees, and it finds as a matter of fact that the jury's separate awards are duplicative here.  Throughout this litigation, Marten sought the same damages for lost profits for each of its claims.  In the pretrial order, Marten did not allege different measures of damages depending on the particular claim, but rather applied its damage calculations in the same way to all claims.  At trial, Marten presented evidence of damages only in the form of lost profits, and in closing, it requested the same total award of lost profits for each claim.  The Court actually addressed this potential issue with the parties at the instruction conference, and as a result of that discussion, the Court added the following language to each of the two instructions relating to actual damages:  "If you award damages for [this/any] claim, you should determine the amount without consideration of or reference to any other claim in the case or any other damage award you may make."  Marten did not object to this language in the two instructions.  These facts indicate that any separate awards by the jury represent the same damages for lost profits, and the awards are therefore duplicative.

The parties agree that the Tenth Circuit's standard from *ClearOne Communications, Inc. v. Biamp Systems*, 653 F.3d 1163 (10th Cir. 2011), is applicable here.  In *ClearOne*, the jury was instructed to "assess [compensatory] damages for each claim separately and without regard to whether you have already awarded damages on another claim."  *See id.* at 1178.  The jury then made separate awards for lost profits in identical amounts for each of two defendants.  *See id.*  The district court granted the plaintiff's request for a total judgment of twice the amount of each separate award, on

the basis of its assumption that the jury intended to award total damages in the amount of the sum of the two awards. *See id.* at 1178-79. The Tenth Circuit reversed the improper additur because it was "entirely possible" that the jury intended to award total damages in the lesser amount. *See id.* at 1179. The Court held as follows:

> Accordingly, a district court cannot enter a judgment that may exceed what the jury awarded. Where a jury verdict is ambiguous—where it is possible that the jury apportioned damage but it is also possible that the jury found a lower total damages figure—a judgment for the higher amount risks additur.
>
> . . . If it is not absolutely clear that the jury apportioned damages, then the district court's assumption that the jury apportioned damages risks additur. . . . [W]e hold that a district court cannot select an interpretation of an ambiguous verdict that possibly exceeds what the jury intended to award, even if it appears that the jury apportioned damages.

*See id.* at 1179-80 (citations omitted). In that case, the Tenth Circuit concluded that the verdict was at least susceptible to the interpretation that the jury intended to award total damages in the lesser, non-aggregated amount—an interpretation that would have been "consistent with the jury instructions and [the court's] usual presumption that juries follow instructions." *See id.* at 1180 (citing *Watts v. Laurent*, 774 F.2d 168, 180 (7th Cir. 1985)). Even though the district court's conclusion that the jury apportioned the total damages was "plausible," that conclusion was "not inescapable," as the jury could reasonably have found that the plaintiff suffered the lesser amount in lost profits; thus, the case was not one in which the jury's verdicts were "logical and probable only if they are aggregated." *See id.* at 1180-81 (quoting *City of Richmond v. Madison Mgmt. Group*, 918 F.2d 438, 461 (4th Cir. 1990)).

The Tenth Circuit's opinion in *ClearOne* compels the denial of Marten's motion. As in that case, the jury was specifically instructed to award damages for each claim without consideration for any other claim, and the Court must presume that the jury followed that instruction. *See id.* at 1180. Moreover, the jury's verdict is not logical only if the damage awards are aggregated. Marten argues that its claim for lost profits in excess of $3 million must have been split up among the actual and punitive damage awards. The jury's awards for compensatory damages, however, totaled only $1,250,000, and the instructions made clear that punitive damages were separate from any actual damages. In addition, Marten offered evidence of variables and presented in closing a calculation to the jury that would support an award in excess of $4 million for lost profits; thus, the jury clearly intended to award less than the amount claimed, and there is no basis to believe that the jury intended to award either $3,250,000 or $1,250,000 in total actual damages. Moreover, as PlattForm points out, even if the jury intended to award $1,250,000, it might reasonably have split that amount more evenly among the four awards for actual damages. Finally, the Court does not agree with Marten that its evidence concerning the amount of damages went unchallenged at trial. Marten's assumption that it would have made hires from four percent of the withheld applications was especially disputed, as PlattForm introduced evidence that Marten actually hired from PlattForm's and others' internet job board applications at a far lower rate. Marten's decision not to continue to pay for placement on PlattForm's site also provided evidence that the receipt of applications from that site was not so valuable as

33

Marten's damage claim would suggest.  Thus, the jury could reasonably have decided to award total damages only in the separate amounts stated on the verdict form, in accordance with the jury instructions—reflecting a maximum total award of $500,000 for lost profits in this case.  Because it is not "absolutely clear" in this case that the jury intended to award actual damages in the aggregated amount of $1,250,000, the Court cannot interpret the jury's verdict in that manner, and the Court therefore denies Marten's request that the judgment be amended.[8]

## 2.    ENHANCED DAMAGES

Alternatively, Marten moves the Court for a total award of actual damages totaling $1,250,000 under 15 U.S.C. § 1117(a), which provides as follows:

> In assessing damages, the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount.  If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case.  Such sum in either of the above circumstances shall constitute compensation and not a penalty.

*See id.*  The Court is not required to award enhanced or treble damages; rather, this provision allows the Court to award additional damages in its discretion.  *See United Phosphorus*, 205 F.3d at 1236.

It may seem anomalous for the statute to provide for an award over the amount

---

[8]Marten has not argued or moved to set aside the verdicts on the basis that the different amounts awarded by the jury for the different claims are improperly inconsistent and should be altered.

found as actual damages while requiring such award to be compensatory and not punitive. *See Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1127 (5th Cir. 1991). The court in *Taco Cabana* responded to that seeming anomaly by noting that an enhancement could, consistent with principles of equity, "provide proper redress to an otherwise undercompensated plaintiff where imprecise damage calculations fail to do justice." *See id.* The Court agrees, and it thus considers whether plaintiff would be sufficiently compensated by an award of $500,000 in actual damages. *See United Phosphorus*, 205 F.3d at 1236 (district court did not abuse its discretion in refusing to award enhanced damages under Section 1117(a) where the jury award adequately compensated the plaintiff).

The Court concludes that Marten would not be undercompensated by an award of actual damages in the amount of $500,000. Marten repeats the claim it made to the jury—that it suffered millions of dollars in damages for lost profits, calculated using its figures of 5,157 applications, four percent hires, 52 weeks average longevity, $3,490 per week per driver in revenue, and a 10.79 percent profit margin. The Court is persuaded, however, based on the evidence presented at trial, that Marten's actual damages are not nearly so extensive. First, the fact that Marten chose not to renew with the site provides strong evidence that the receipt of applications from the site did not translate into a significant amount of revenue and profit to Marten. Second, PlattForm submitted evidence that severely undercuts Marten's use of its historic rate of turning four percent of applications into hires. PlattForm submitted records showing that applications to

Marten from various internet job boards, including another of PlattForm's sites, resulted in hires by Marten at a rate far lower than one percent.[9]  Moreover, additional evidence showed that, over a period of 13 months in 2011 and 2012, before Marten chose not to continue renewing with the relevant website, justtruckingjobs.com (JTJ), Marten made only 13 hires from applications submitted through that site—a far cry from the approximate total of 200 hires from JTJ during the infringement period that Marten's damage theory presumes.  Based on this evidence, the Court is persuaded that Marten's actual damages did not exceed $500,000.  Therefore, because the jury's award of damages would not undercompensate Marten for its actual loss, the Court declines in its discretion to award enhanced damages to Marten under Section 1117(a), and Marten's motion for such relief is denied.

### VI.    Disgorgement of PlattForm's Profits

Marten also seeks disgorgement of PlattForm's profits, in the amount of $196,298.98, pursuant to Section 1117(a).  That statute provides that a prevailing plaintiff may recover, "subject to the principles of equity," the defendant's profits.  *See*

---

[9]The records for nine separate months in 2013 and 2014 show that 33,167 total applications to Marten from internet job boards resulted in 36 hires, for a rate of 0.11 percent.  Marten disputed at trial that those records actually reflected applications and not mere leads; based on the records' separate counts for applications and leads, however, the Court is persuaded that the records referred to actual applications through the internet sites, in the same sense that Marten points to 5,157 applications withheld by PlattForm.

15 U.S.C. § 1117(a).  The statute further provides that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  *See id.*  "Under the Lanham Act, plaintiffs must show either actual damages or willful action on the part of the defendant as a prerequisite to recover disgorgement of profits."  *See Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1161 (10th Cir. 2013).  Marten recovered actual damages in this case; thus, it qualifies to seek disgorgement in this case.  Disgorgement does not necessarily follow from a finding of infringement or an award of damages, however:

> An accounting of profits is not automatically granted upon a showing of infringement.  Rather, the propriety of such relief is determined by equitable considerations.

*See Bishop v. Equinox Int'l Corp. (Bishop I)*, 154 F.3d 1220, 1222 (10th Cir. 1998) (citations omitted).  "[T]he district court has wide discretion to fashion an appropriate remedy."  *See Estate of Bishop v. Equinox Int'l Corp. (Bishop II)*, 256 F.3d 1050, 1055 (10th Cir. 2001).  "[B]ecause disgorgement of profits is an equitable remedy, the Court must weigh principles of equity before awarding disgorged profits."  *See Klein-Becker*, 711 F.3d at 1161 (internal quotation omitted).  "Even with a finding of willfulness, a court may still exercise its discretion to reduce or even eliminate a profit award in the name of fashioning an equitable remedy to meet the needs of each case."  *See Western Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1273 (10th Cir. 2005).  "[A]n award of profits under the Lanham Act is truly an extraordinary remedy and should be tightly cabined by principles of equity."  *See id.* at 1274.

In arguing that the Court should disgorge PlattForm's profits in this case, Marten notes the jury's award of punitive damages, and it cites the same evidence that supports that award—for instance, PlattForm's decision to leave Marten and other companies on the website, while rerouting applications, for over a year, without informing users of the site; and PlattForm's use of Marten's marks after Marten's cease-and-desist letter to PlattForm and even after commencement of this suit. *See infra* Part VII.

The Court in its discretion, however, upon a consideration of the equities, declines to award Marten any of PlattForm's profits under Section 1117(a). First, as discussed above, the Court is persuaded from the totality of the evidence that a total award of $500,000 for lost profits amply and fully compensates Marten for any loss that it suffered in this case. *See supra* Part V.C.2.

Second, the award of punitive damages (when considered with the attorney fees awarded herein) already provides a windfall to Marten while providing sufficient punishment and deterrence for PlattForm; thus, an additional award of PlattForm's profits is not necessary to achieve any such aim. *See Western Diversified*, 427 F.3d at 1272 (noting the punitive nature of the disgorgement remedy and the possible goal of deterrence where the remedy is not intended to substitute for the plaintiff's actual damages).

Third, although the evidence was sufficient to support an award of punitive damages under a particular standard under Wisconsin law, *see infra* Part VII, the Court does not agree with Marten that PlattForm's conduct was particularly egregious in the

context of typical trademark infringement claims. In particular, the Court is persuaded by the evidence at trial that although PlattForm acted in disregard of Marten's rights, it did not do so with the intent to harm Marten or to steal its customers (or potential employees).

Fourth, the Court is persuaded that PlattForm's profits resulting from its infringement are not significant. Under Section 1117(a), a plaintiff must only prove the defendant's revenues before the burden shifts to the defendant to show any costs or deductions. *See* 15 U.S.C. § 1117(a). At trial, Marten submitted an exhibit showing PlattForm's monthly revenues for operating the JTJ site (totaling $196,298.98 for the period from August 2012 to September 2013). Marten argues that PlattForm failed to provide any evidence to meet its burden to show that those amounts do not represent PlattForm's profit resulting from the infringement. The same exhibit, however, shows that PlattForm's revenues decreased only slightly after PlattForm removed Marten's marks from JTJ. PlattForm's average monthly revenue during the infringement period exceeded its average monthly figure for the same duration after the infringement by less than $2,000 per month. That evidence is sufficient to persuade the Court that PlattForm's profits specifically traceable to the infringement likely did not exceed $25,000 and may have been far less. Given the awards of compensatory and punitive damages in this case, the Court is confident that PlattForm will not be unjustly enriched by its infringement. *See Western Diversified*, 427 F.3d at 1272 (noting that one justification for disgorgement that is not intended to compensate plaintiff for actual

damages is the prevention of unjust enrichment of the defendant).

In sum, the Court, in weighing the equities in its discretion, concludes that disgorgement of PlattForm's profits is not an appropriate remedy in this case. The Court therefore denies Marten's motion for such relief.

### VII.   **Punitive Damages**

#### A.   *Sufficiency of the Evidence*

PlattForm seeks judgment as a matter of law on Marten's claim for punitive damages, arguing that the evidence supporting such an award was insufficient.[10] At trial, the Court allowed the jury to consider an award of punitive damages with respect to Marten's claims under Wisconsin common law for trademark infringement and unfair competition and for tortious interference. PlattForm has not disputed that punitive damages may be recovered for such torts in appropriate circumstances.

Under Wisconsin law, a plaintiff "may receive punitive damages if evidence is submitted showing that the defendant acted maliciously toward the plaintiff or in an intentional disregard of the rights of the plaintiff." *See* Wis. Stat. § 895.043. The Court instructed the jury concerning the applicable standard for an award of punitive damages as follows:

---

[10]PlattForm also argues that Marten is not entitled to recover punitive damages because its claim for actual damages fails as a matter of law. Because the Court has denied PlattForm's motion for judgment on the award of lost profits, *see supra* Part V.A, it also rejects this basis for judgment on the punitive damages claim.

Punitive damages may be awarded, in addition to actual compensatory damages, if you find by clear and convincing evidence that PlattForm acted maliciously toward Marten or in an intentional disregard of the rights of Marten.

A party's acts are malicious when they are the result of hatred, ill will, desire for revenge, or inflicted under circumstances where insult or injury is intended.

A party acts in an intentional disregard of the rights of a plaintiff if the party acts with the purpose to disregard the plaintiff's rights, or is aware that its acts are substantially certain to result in the plaintiff's rights being disregarded. Before you can find an intentional disregard of the rights of Marten, you must be satisfied that PlattForm's act or course of conduct was:

1. deliberate;
2. an actual disregard of a property right or some other right of Marten; and
3. sufficiently aggravated to warrant punishment by punitive damages.

A party's conduct giving rise to punitive damages need not be directed at the plaintiff seeking punitive damages. There is no requirement that PlattForm intended to cause harm or injury to Marten.

PlattForm did not object at trial to the content of this instruction (it only objected to the submission of the claim to the jury), nor has PlattForm taken issue in its posttrial briefs with this standard under Wisconsin law.

PlattForm argues that Marten may not recover punitive damages because, as a matter of law, PlattForm's conduct was neither malicious nor aggravated (as required for a finding of an intentional disregard for Marten's rights). PlattForm cites evidence that it left Marten's marks on its site only out of a concern for damage to SEO or to the site itself; that it promptly removed the marks after receiving Marten's cease-and-desist

41

letter; and that the subsequent craigslist posts about Marten resulted from a simple mistake by an uninformed employee.

PlattForm's argument, however, does not account for contrary evidence presented a trial, and all of the evidence must be viewed in Marten's favor at this stage.  It is undisputed that PlattForm made the conscious decision to leave Marten's marks on the website; thus, a jury could reasonably find that PlattForm's act was deliberate.  As noted above, *see supra* Part III.A, the jury could reasonably have found that PlattForm knew that it did not have Marten's consent to use the marks.  Thus, there was sufficient evidence that PlattForm at least was aware that its acts were substantially certain to result in Marten's trademark rights being violated and thus disregarded.  Finally, there was evidence from which the jury could reasonably have found that PlattForm's acts were sufficiently aggravated to warrant punishment.  PlattForm did not mistakenly leave Marten's marks on its site; rather, it deliberately chose to do so.  PlattForm did so for its own benefit, without concern for Marten's potential loss of applications.  PlattForm never informed users of the site, and thus PlattForm placed its own interest above that of individuals whose applications would never reach their intended destinations.  PlattForm's wrongful acts were not limited solely to Marten's marks, as PlattForm made the same decision to leave at least eight other trucking companies on the site while diverting applications intended for those companies.  PlattForm has insisted that it intended to leave Marten and the other companies on the site (while diverting applications) only while it figured out how to avoid affecting SEO and the site's

integrity; but there was no evidence that it subsequently worked on that problem to seek a better solution, its "figuring-out" time lasted over a year, and it stopped only when caught by Marten.  Moreover, even after it was caught and Marten initiated legal action, PlattForm was not careful enough to avoid using Marten's marks again without authorization.

Viewed in the light most favorable to Marten, the evidence was sufficient to allow a reasonable jury to conclude that PlattForm acted with an intentional disregard of Marten's rights.  Thus, the Court denies PlattForm's motion for judgment on Marten's claim for punitive damages.

*B.*     *Application of the Statutory Cap*

The jury awarded Marten $2,000,000 in punitive damages on the Wisconsin common-law claims, and the Court's original judgment included that award.  PlattForm now moves the Court for an amendment of the judgment to account for the application of the statutory cap on punitive damages under Wisconsin law.

Wis. Stat. § 895.043(6) caps punitive damages received by a plaintiff under Wisconsin law at twice the amount of any compensatory damages or $200,000, whichever is greater (with some exceptions not applicable here).  Marten does not dispute that the cap applies here.  In this case, on the Wisconsin common-law claims for which punitive damages were available, the jury awarded Marten $250,000.  For the same reasons discussed above, *see supra* Part V.C.1, those two awards are duplicative, and Marten would be entitled to receive only one award of compensatory damages on

these claims in the amount of $250,000. Marten has not offered any argument that this figure of $250,000 should not be used if the Court has denied Marten's request for a higher total award (as it has). Thus, the Court grants this portion of PlattForm's motion, and it will amend the judgment to reflect a punitive damage award of $500,000 (twice $250,000).

## VIII.    Prejudgment Interest

Marten moves for an award of prejudgment interest. The Tenth Circuit has noted that, with respect to federal claims, it has "adopted a preference, if not a presumption, for prejudgment interest," and that it is not dispositive under federal law whether or not the damages were liquidated. *See United Phosphorus*, 205 F.3d at 1236-37. The Court must consider whether an award of prejudgment interest would serve to compensate Marten and, if so, whether equity precludes an award. *See id.* at 1237.

First, PlattForm points out that any interest on the award of punitive damages would not serve to compensate Marten for any loss, and it argues that any award of interest should therefore be limited to the award of compensatory damages. Marten did not address this point in its reply brief. The Court agrees that an award of interest on the punitive damage award would not serve to compensate Marten. Marten suffered any lost profits, however, prior to the date from which it seeks an award of interest (September 15, 2014, the date of the filing of this suit), and thus an award of prejudgment interest on the compensatory damage award *would* serve to compensate Marten for the actual

loss of the use of those profits.

Second, PlattForm argues that equity precludes an award of interest here, based on litigation delay caused by Marten's unsuccessful pursuit of its claim for damages relating to posts on the findatruckingjob.com (FaTJ) website.  The Court is not persuaded, however, that the parties' litigation of that claim prior to the Court's summary judgment ruling caused any appreciable delay in the trial and ultimate resolution of this case.  PlattForm has not offered any other reason why equity would preclude an award of prejudgment interest here.  Accordingly, the Court concludes, in light of the Tenth Circuit's stated preference for prejudgment interest, that such an award is warranted here with respect to the actual damages award.

The rate of prejudgment interest is left to the Court's discretion.  *See Kleier Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1042 n.4 (10th Cir. 1990). Courts in this district have consistently applied the federal postjudgment interest rate set by 28 U.S.C. § 1961 in awarding prejudgment interest on federal claims.  *See, e.g.*, *Conoco Inc. v. J.M. Huber Corp.*, 148 F. Supp. 2d 1157, 1177 (D. Kan. 2001) (citing *In re DOE Stripper Well Exemption Litig.*, 821 F. Supp. 1432, 1437 (D. Kan. 1993)), *aff'd*, 289 F.3d 819 (10th Cir. 2002).  Marten has not provided any reason why the Court should not apply that same rate in this case.  Marten cites *EarthGrains Baking Companies, Inc. v. Sycamore Family Bakery Inc.*, 2012 WL 2419953 (D. Utah June 26, 2012), in which the court applied a rate two points higher than the federal postjudgment interest rate.  *See id.* at *2.  In that case, however, the court stated that it was following

45

Utah law, *see id.*, which law would not apply here.  The Court therefore will apply the postjudgment rate as courts have consistently done in this district.

The applicable postjudgment rate, as reflected in the Court's initial judgment, is 0.58 percent per annum, compounded annually.  *See* 28 U.S.C. 1961 (providing for annual compounding).  Applying that rate to the award of $500,000, from September 15, 2014, (the date of the filing of this suit) to May 6, 2016, (the date of the original judgment) (a period of one year and 243 days) compounded annually, yields a total award of prejudgment interest in the amount of $4,841.88.  Marten's motion for prejudgment interest is granted in part to that extent, and the Court's amended judgment will include such an award.[11]

## IX.   **Attorney Fees**

### A.   *Lanham Act*

Marten moves for an award of attorney fees under the Lanham Act, which provides that "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  *See* 15 U.S.C. § 1117(a).  The Tenth Circuit has stated that an "exceptional" case for purposes of awarding fees under Section 1117(a) is one in which

---

[11]While federal law governs an award of prejudgment interest on the federal claims, Wisconsin law would govern an award of interest on the claims in this case under state law. *See United Phosphorus*, 205 F.3d at 1236.  In this case, the award under state law was only half as much as the award under federal law, and Marten has not sought an award of interest under Wisconsin law.  Thus, the Court has not considered the standard for awarding interest under Wisconsin law.

the trademark infringement was "malicious, fraudulent, deliberate or willful."  *See Western Diversified*, 427 F.3d at 1273 (citations and internal quotations omitted).  The Tenth Circuit has not had the opportunity, however, to review that standard in light of the Supreme Court's opinion in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014).

In *Octane Fitness*, in a unanimous opinion, the Supreme Court established the standard for determining when a case is "exceptional" for purposes of awarding attorney fees under a provision of the Patent Act that is identical to the Lanham Act's fee provision.  *See id.*  The Patent Act (like the Lanham Act) does not define "exceptional", so the Court applied the term's ordinary meaning of "uncommon", "rare", or "not ordinary."  *See id.* at 1756 (citing, *inter alia*, *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 771 F.2d 521, 526 (D.C. Cir. 1985), in which the D.C. Circuit interpreted "exceptional" in the Lanham Act's identical provision to mean "uncommon" or "not run-of-the-mill").  Thus, the Court held as follows:

> We hold, then, that an "exceptional" case is simply one that stands out from the others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated.  District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances. As in the comparable context of the Copyright Act, there is no precise rule or formula for making these determinations, but instead equitable discretion should be exercised in light of the considerations we have identified.

*See id.* (citations and internal quotations omitted).  The Court thus rejected a stricter

47

standard adopted by the Federal Circuit under the Patent Act.  *See id.* at 1756-58.

In *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303 (3d Cir. 2014), the Third Circuit held that the Supreme Court's standard from *Octane Fitness* should also apply to the decision whether to award attorney fees under the Lanham Act.  *See id.* at 814-15. In so holding, the court noted that the fee provisions under the Patent Act and the Lanham Act are identical and that Congress in fact referenced the Patent Act provision in amending the Lanham Act to allow for an award of fees.  *See id.* at 814 (citing S. Rep. No. 93-1400, at 2 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7132, 7133).  The court also noted that the Supreme Court in *Octane Fitness* had relied on a case from the D.C. Circuit (*Noxell*) that involved, in the words of the *Octane Fitness* Court, the "identical" fee provision from the Lanham Act.  *See id.* at 814-15 (citing *Octane Fitness*, 134 S. Ct. at 1756 (quoting *Noxell*)).  The Third Circuit thus stated its belief "that the Court [in *Octane Fitness*] was sending a clear a message that it was defining 'exceptional' not just for the fee provision in the Patent Act, but for the fee provision in the Lanham Act as well."  *See id.* at 815.  Accordingly, based on *Octane Fitness*, the court held that "a district court may find a case 'exceptional,' and therefore award fees to the prevailing party, when (a) there is an unusual discrepancy in the merits of the positions taken by the parties or (b) the losing party has litigated the case in an unreasonable manner."  *See id.* (citations and internal quotation omitted).

The Fourth Circuit and the Fifth Circuit have followed the Third Circuit's lead in applying the standard for an exceptional case from *Octane Fitness* to the identical

provision in the Lanham Act.  *See Georgia-Pacific Consumer Prods. LP v. von Drehle Corp.*, 781 F.3d 710, 720-21 (4th Cir. 2015) (citing *Fair Wind Sailing*); *Baker v. DeShong*, 821 F.3d 620, 622-25 (5th Cir. 2016) (citing *Fair Wind Sailing* and *Georgia-Pacific* in deciding to "join our sister circuits").  The Sixth Circuit and the Ninth Circuit have also indicated that the *Octane Fitness* standard may apply to the Lanham Act.  *See Slep-Tone Entertainment Corp. v. Karaoke Kandy Store, Inc.*, 782 F.3d 313, 317-18 (6th Cir. 2015) (noting that the two fee provisions are identical and that such statutes should be interpreted consistently, and instructing the district court on remand to assess the applicability of *Octane Fitness* to a fee request under the Lanham Act); *Globefill Inc. v. Elements Spirits, Inc.*, __ F.  App'x __, 2016 WL 685038, at *1 (9th Cir. Feb. 19, 2016) (unpub. op.) (holding that the district court did not err in denying a motion for attorney fees under the Lanham Act under either the *Octane Fitness* standard or the standard from the Ninth Circuit's precedents).  No federal appellate court to have considered the question has failed to apply the *Octane Fitness* standard to the Lanham Act's fee provision.

As noted above, the Tenth Circuit has not had the opportunity to address this issue.  The Court is confident, however, that when that opportunity arises, the Tenth Circuit will join its sibling circuits and adopt the Supreme Court's standard from *Octane Fitness* for use in applying the Lanham Act's attorney fee provision.  As noted by the Third Circuit, Congress referenced the Patent Act's fee provision in enacting the Lanham Act's fee provision, and the Supreme Court has indicated that identical language from

statutes—particularly attorney fee statutes—should be interpreted in a consistent manner. *See Independent Fed. of Flight Attendants v. Zipes*, 491 U.S. 754, 758 n.2 (1989) ("We have stated in the past that fee-shifting statutes' similar language is a 'strong indication' that they are to be interpreted alike.").   In addition, the Court agrees with the Third Circuit that the Supreme Court's reliance on an interpretation of "exceptional" from a Lanham Act case demonstrates that Court's intent that the statutes be interpreted in like manner.   Accordingly, the Court will apply the Supreme Court's standard from *Octane Fitness* in determining whether the present case is "exceptional" for purposes of Marten's request for attorney fees under the Lanham Act.

The Court concludes that this case is *not* exceptional or uncommon under either of the two prongs cited in *Octane Fitness*.   First, the Court cannot conclude that Marten's positions on the merits of this case were so strong, or that PlattForm's defenses were so weak, that the case is uncommon with respect to the relative strengths of the parties' substantive litigating positions.   Although Marten prevailed on all claims submitted to the jury, PlattForm was awarded summary judgment on some claims, and Marten sought damages far in excess of those awarded by the jury.   Second, there is no basis to conclude that the case was unusual with respect to the manner in which PlattForm litigated the case.   Accordingly, the Court concludes in its discretion that this is not an "exceptional" case and that Marten therefore is not entitled to recover attorney fees

under the Lanham Act.[12]

### B.    *Wisconsin Statute*

Marten also seeks an award of attorney fees based on the jury's finding of liability under Wis. Stat. § 895.446.  That statute provides that if the plaintiff prevails in a civil action under the statute, "he or she may recover all of the following: (a) Actual damages . . .; [and] (b) All costs of investigation and litigation that were reasonably incurred . . . ."

The Court first addresses whether an award of attorney fees under the statute to a prevailing plaintiff is mandatory or discretionary.  In arguing that such an award is discretionary, PlattForm does not address the language of the statute, but instead cites only an unpublished opinion of the Wisconsin Court of Appeals, *Stathus v. Horst*, 2001 WL 347769 (Wis. Ct. App. Apr. 10, 2001) (unpub. op.).  In that case, the court stated that the predecessor statute to Section 895.446 (with identical language concerning the recovery of litigation costs) "permits, but does not require" an award of attorney's fees. *See id.* at *6 n.2.  The court did not cite any authority for that statement other than the statute itself.  Nor has the Court located any other authority resolving this question under Wisconsin law.  *See Kolupar v. Wilde Pontiac Cadillac, Inc.*, 683 N.W.2d 58, 65 (Wis. 2004) (declining to resolve whether fee award is discretionary under statute that provides

---

[12]Even if the Court were to apply the Tenth Circuit's standard from *Western Diversified* and find that this is an exceptional case based on willful or deliberate conduct by PlattForm, Marten's ultimate recovery would not change, as the Court would award the same amount of fees under the Lanham Act as it does under the Wisconsin statute.

that a plaintiff suffering pecuniary loss "may recover damages . . . together with . . . reasonable attorney fees").  Nevertheless, the Court is persuaded that the plain language of the statute makes an award of attorney fees mandatory.  It is true that the word "may" normally connotes permissiveness.  *See SBKC Serv. Corp. v. 1111 Prospect Partners, L.P.*, 105 F.3d 578, 581-82 (10th Cir. 1997).  Thus, if the statute stated that the court "may" award fees, then the award would be discretionary with that court.  Instead, however, the statute states that the prevailing plaintiff "may" recover litigation costs—thus any discretion lies with the plaintiff, who may choose to pursue an award of fees or not to make such a claim.  Marten has chosen to assert such a claim for fees in this case; thus, because Marten prevailed in proving liability under the statute, an award of its reasonable attorney fees is mandated.  *See Zapata County Appraisal Dist. v. Coastal Oil & Gas Corp.*, 90 S.W.3d 847, 853 (Tex. Ct. App. 2002) (under Texas law, "statutes providing that a party 'may recover' . . . attorney fees are not discretionary") (quoting *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998)); *Kimbrough v. Fox*, 631 S.W.2d 606, 609 (Tex. Ct. App. 1982) (interpreting such language as mandatory, allowing the plaintiff "the permission to recover the fees he is able to prove reasonable;" if the legislature had intended to make fees discretionary, the permissive language would have provided that the court may award such fees); *Pepitone v. Winn*, 722 N.W.2d 710, 712-14 (Neb. 2006) (concluding that attorney fees are mandatory under a statute providing that the plaintiff "may recover" damages and fees) (citing cases); *see also Kolupar*, 683 N.W.2d at 65 (although not resolving the issue, noting that the statute

stated not that the court may award fees but that the plaintiff may recover fees).

C.    <u>Amount of Fees</u>

The Court must then determine the amount of attorney fees that were reasonably incurred by Marten, who seeks an award in the total amount of $767,205.40. In *Hensley v. Eckerhart*, 461 U.S. 424 (1983), the Supreme Court set forth a methodology for determining a reasonable award of attorney fees, under which a court first determines a "lodestar" figure that represents "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *See id.* at 433.  The Wisconsin Supreme Court has adopted the *Hensley* lodestar methodology.  *See Kolupar*, 683 N.W.2d at 67.  The Court thus begins by determining a lodestar amount in this case.

The Court first determines reasonable hourly rates for Marten's attorneys and paralegals.  The Court's focus is on the prevailing market rate in this community for similar services. *See United Phosphorus*, 205 F.3d at 1234.  The overwhelming majority of hours billed by Marten's attorneys were billed by partner Harry Van Camp (average hourly rate for 2014, 2015, and 2016 of $375, $390, and $390); partner John Gardner ($274.66/$285/$296.74); associate Chase Horne ($210/$225/$240); and paralegal Susan George ($170/$175/$180).  Marten relies on a Kansas Bar Association (KBA) report that lists a mean billing rate for 2012 in Kansas of $326 per hour for attorneys practicing intellectual property law (the highest rate for any field of law), and it argues that Mr. Van Camp's rates were reasonable based on that report in light of the five percent average yearly rate increase noted in the same report. *See Mr. Elec. Corp. v. Khalil*, 2013 WL

5651398, at *6 (D. Kan. Oct. 16, 2013) (finding that this KBA report accurately reflects prevailing rates in the Kansas City area).  It further argues that it reasonably used attorneys with lower billing rates to perform much of the work on this case.

The Court is persuaded, however, that lower hourly rates should be used in calculating the lodestar in this case, in light of the KBA report and the Court's familiarity with the litigation.  Although the case involved trademark infringement, the case did not present particularly complex or difficult intellectual property issues.  The contested issues here more resembled a garden-variety contract case.  Thus, the Court finds that it is not appropriate to use the very highest rate listed in the KBA report for this case. The report shows that all partners in Kansas in 2012 billed at a median hourly rate of $235 and a mean rate of $256.  Thus, the Court applies a reasonable rate for Mr. Van Camp's hours of $300 per hour for the entire course of the litigation.  Mr. Gardner is a partner at his firm, but the Court concludes that this case would have been reasonably staffed by only one partner.  For associates with ten years of experience, the report lists median and mean rates of $200 and $217; thus, the Court deems $230 to be a reasonable rate for Mr. Gardner's hours.  The Court will use a reasonable rate of $200 for Mr. Horne's hours, based on median and mean rates for associates of $175 and $180.

To support its paralegal billing rates, Marten cites the affidavit of its local counsel, who states that his firm bills paralegal time at $190 per hour.  The Court does not believe it to be reasonable to charge paralegal time at a rate so near the rate for associate attorneys, however, and the KBA report gives a median rate of $85 for even

54

the most experienced paralegals.  Thus, the Court will use a reasonable rate of $100 for Ms. George's time.

Marten's local counsel, David Jermann, billed at rates of $385, $400, and $420 in this case, but his billing entries indicate that he primarily performed tasks (such as reviewing documents) typically performed by an attorney acting solely as local counsel and not as primary counsel.  Thus, there is no basis to allow such time at the highest, intellectual-property-attorney rate.  Such a role could reasonably have been filled by an attorney billing at a much lower rate.  Accordingly, the Court will award fees for his time (and for time by another attorney at his firm) at a rate of $230, the same rate used for Mr. Gardner.  The Court will also reduce local counsel's paralegal billing rate from $180 and $190 to $100 per hour.

The Court next considers the number of hours reasonably expended in this case. Local counsel failed to include detailed billing information for some of his firm's fees, and the Court eliminates those hours for that reason.  *See United Phosphorus*, 205 F.3d at 1233-34 ("The district court can reduce the number of hours when the time records provided to the court are inadequate.").  The Court also concludes that the time billed by local counsel, consisting substantially of reviewing documents, is excessive and largely duplicative of work performed by other counsel.  Thus, the Court will reduce the remaining local counsel attorney time from 36.1 hours to 20 hours.

The Court now addresses the time billed by Mr. Van Camp's firm.  PlattForm complains about Marten's fees incurred for work prior to the filing of this suit.  The fee

statute, however specifically allows for the recovery of the costs of litigation *and investigation*. *See* Wis. Stat. § 895.446.  The Court therefore overrules this objection by PlattForm.

The Court does agree with PlattForm, however, that the time billed by Marten's attorneys in this case was excessive and that the attorneys overstaffed the case.[13]  Marten states that the case was primarily staffed by the four individuals whose rates are discussed above, and the overwhelming majority of hours were billed by those individuals.  Thus, the Court exercises its discretion to limit the award of fees to the hours billed by those four individuals.  *See United Phosphorus*, 205 F.3d at 1234 (upholding determination of hours in which the district court found that the case had been overstaffed and thus eliminated billing for individuals who spent minimal time on the case).  The Court also reduces the number of hours billed by Mr. Van Camp, Mr. Gardner, and Mr. Horne by ten percent in light of the excessive time throughout the case. The Court also agrees with PlattForm that the paralegal's attendance at three depositions (including four travel days for those depositions) was not reasonable, and the Court therefore removes 87.1 hours from Ms. George's time.

Finally, the Court notes that fees are recoverable on only one of Marten's claims (the Wisconsin statutory claim).  Although all of Marten's claims were related, Marten's

---

[13]PlattForm specifically complains about the attendance of two attorneys at a deposition and the number of attorneys and amount of time used to prepare various briefs.

attorneys did spend time on tasks relating only to the other claims.  Accordingly, the Court eliminates ten percent of hours for all timekeepers on that basis.  *See id.* at 1233 (district court did not err in reducing the fee award by 20 percent (after eliminating unreasonably billings) to account for claims that did not allow for the recovery of attorney fees); *The Post Office v. Portec, Inc.*, 913 F.2d 802, 813 (10th Cir. 1990) (upholding similar 20 percent reduction), *vacated on other grounds*, 499 U.S. 915 (1991).

As a result of these findings, the Court calculates the resulting lodestar amount as $431,204.80, as follows:

| | | | |
|---|---|---|---|
| Mr. Van Camp | 670.5 hrs - 20% | = 536.4 hrs x $300 | = $160,920 |
| Mr. Gardner | 577.7 hrs - 20% | = 462.16 hrs x $230 | = $106,296.80 |
| Mr. Horne | 653 hrs - 20% | = 522.4 hrs x $200 | = $104,480 |
| Ms. George | 693.8 - 87.1 - 10% | = 546.03 hrs x $100 | = $54,603 |
| Mr. Jermann | 20 hrs - 10% | = 18 hrs x $230 | = $4,140 |
| Local paralegals | 8.5 hrs - 10% | = 7.65 hrs x $100 | = $765 |
| TOTAL | | | $431,204.80 |

The Court concludes that no adjustments to this lodestar amount are warranted. PlattForm argues that Marten was unsuccessful on some claims in the case, especially with respect its claim for damages relating to the FaTJ website.  Those claims were related factually and legally to the other claims, however.  *Cf. Hensley*, 461 U.S. at 434-35 (time spent on unsuccessful claims based on different facts and legal theories may be

eliminated).  The Court also disagrees with PlattForm that Marten's overall success was limited, as Marten's attorneys achieved a very good result, including an award of punitive damages.  *See id.* at 435 ("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.").  The Court thus awards Marten attorney fees in the amount of $431,204.80.[14]

IT IS THEREFORE ORDERED BY THE COURT THAT defendant PlattForm's motion seeking posttrial relief (Doc. # 213) is hereby **granted in part and denied in part**.  The motion is granted with respect to PlattForm's request that the judgment be amended in accordance with the applicable statutory cap on punitive damages.  The motion is otherwise denied.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiff Marten's motion seeking posttrial relief (Doc. # 205) is hereby **granted in part and denied in part**.  The motion is granted in part with respect Marten's request for an award of attorney fees pursuant to Wisconsin statute, and the Court awards such fees in the amount of $431,204.80.  The motion is also granted in part with respect to Marten's request for an award of prejudgment interest, and the Court awards such interest at the applicable postjudgment rate on the jury's award of compensatory damages, in the total amount of

---

[14]Marten did not seek to recover either attorney expenses or amounts relating to its own employees' time.

$4,841.88.  The motion is otherwise denied.


IT IS SO ORDERED.


Dated this 26th day of July, 2016, in Kansas City, Kansas.


s/ John W. Lungstrum
John W. Lungstrum
United States District Judge